## Watts et al. v. Chreste et al.
(Decided June 11, 1937.)

**408**

J. SMITH HAYS and H. M. DENTON for appellants.

BRUCE & BULLITT and D. L. STREET for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Affirming.

John W. Watts executed his note to Charles Chreste for $103,650.76 with interest and placed in the hands of the Westview Land Company, as trustee, divers pieces of property, real and personal, with instructions that it should hold, manage, and convert this property into cash, pay this note, and pay what was left to Watts.

Watts later conceived the idea that he had paid to Chreste before this note was executed divers sums of money which Watts regarded as usury and that with these sums eliminated and other payments deducted this note, so Watts thought, would be overpaid and Chreste would owe him quite a sum of money.

On July 12, 1929, Watts sued Chreste in equity for the elimination of the usury he alleged to be in this note, for its cancellation and for a recovery against Chreste of the money Watts claimed he had paid in excess of what he owed Chreste. Chreste by answer put about everything Watts claimed in issue and asserted a counterclaim on his note and other matters. What started out as a suit for usury finally became a suit for an accounting and after six years of litigation Chreste recovered a judgment against Watts for $134,000 and Watts appeals.

Chreste is a man now seventy-five years of age. For more than forty years he was engaged in the purchase of land, the erection of houses thereon, and the subsequent sale of them. In the early nineteen twenties, his health failed and he quit the active conduct of such business and began to wind up his affairs.

Watts occupied the same office as Chreste, he was a young man engaged in this same business, and in 1924, Chreste's health having materially improved, he and Watts began to do business together.

Mr. Wallace Rutherford was associated with Mr. Watts in this business during the years 1925 and 1926, but in the early part of 1927 he sold out to Watts and Chreste and they continued the business. During the time Rutherford was connected with Watts, the latter was the one who gave general attention to the business. Watts and Rutherford at first were actively engaged in this construction work and Chreste financed, advised, and directed them, and, after the retirement of Rutherford, Watts continued in the active construction. At first, there was only an oral agreement as to Chreste's part in this business, but later his part in this business, so Chreste testifies, was definitely set out in this written contract:

"This contract made and entered into by and between John W. Watts party of the first part, and Charles Chreste, party of the second part,

"Witnesseth: That whereas, the first party is engaged in the general construction business in the City of Louisville, County of Jefferson, State of Kentucky, and especially in the construction of residences, and,

"Whereas, the second party has had long experience and is skilled in the real estate business and values by his ability as a real estate broker and builder and individually, and,

"Whereas, the first party has a great many notes upon which monthly payments are to be made and the money derived from the collection of same to be applied to the payment of said obligations owed by the first party, and the said second party is to make collections of such notes as placed with him, and further as a real estate expert he is to pass upon and superintend the purchase of property and the taking of deeds to said property; and he is further to advise with the said first party as to the kind and character of houses to be built and the locations for same, and the said second party is further to see to the examination of titles and surveys of property when necessary, and is to pass upon the advisability of sales of property and financing of same, and to check pay-rolls and any expenditures made by said first party for material and labor.

"The second party agrees to accept the above mentioned employment and to use his best efforts and skill as an expert in said business, but it is distinctly understood that he is only to give that necessary portion of his time to said work that same requires.

"Now the said second party has advanced to said first party certain sums of money, and now, for the consideration above set out the first party is to pay to said second party ten (10%) per cent commission on all loans or monies advanced in financing of purchases or property and the erection of buildings thereon and discounting of notes, and the amount of said commission is to be deducted at the time that the said money is borrowed.

"This contract shall continue until such time as all loans made by second party to the first party become due and payable or liquidated or otherwise terminated by mutual consent of the parties.

"Witness the signatures of the parties of the first and second parts this 11th day of March, 1927.

"John W. Watts
"Charles Chreste."

Watts denies that he signed this contract, but Chreste testifies Watts did sign it. It was prepared for them by a reputable lawyer there in Louisville, who then represented both of them and had done so for some years, and he testifies Watts and Chreste were both present and gave him the information from which he dictated the contract, that he read it over after it was written, and delivered it to the office then occupied by both Watts and Chreste. He says he never saw it afterwards. We are satisfied this contract was executed and represents the agreement between these parties, for this record shows these parties did just what parties would do who had such a contract between them. It is an old saying, "Tell me what you've done under a contract and I can tell you what your contract was." This record is a picture of that contract.

This contract binds Chreste to do six things and Watts to do two. Here is what Chreste was to do: (1) To give the value of his business experience in real estate to the joint enterprise; (2) to collect the payments due on certain monthly notes; (3) to pass upon and superintend the purchase of property and the taking of deeds on said property; (4) to advise with Watts as to the kind and character of houses to be built and the location; (5) to see to the examination of titles and surveys of property when necessary, and pass upon the advisability of sales of property and the financing of the same; and (6) to check pay rolls and any expenditures made by Watts.

In consideration of the foregoing, Watts agreed: (1) To pay Chreste 10 per cent. commission on all loans advanced in financing the purchase of property, and the erection of buildings thereon; (2) to pay Chreste 10 per cent. commission on the discounting of second mortgage notes.

These parties treated this 10 per cent. as a commission. Interest was charged on the money loaned and 10 per cent. was deducted as a commission to pay Chreste for his services. The parties had agreed on this as the pay Chreste should receive for his services and we see

no reason why he should not have had it, but the trial court concluded this was usury and this was called usury and a part of it not barred by limitations was deducted by the court in its judgment and as no cross-appeal has been prosecuted by Chreste we must leave it as it is.

### Plans and Operations.

The actual construction of the houses and the execution of the "Construction Mortgage Notes" began about March, 1925. The "Construction Mortgage Notes" were different from the "Collateral Notes." These "Construction Mortgage Notes" were first mortgages executed by Watts to Chreste to obtain sufficient money to buy the lot and build the house. After the houses were built, second lien notes were obtained by Watts from the purchasers which were assigned to Chreste to secure obligations of Watts termed "Collateral Notes." At that time, neither Watts nor Rutherford put much capital into the account (not over $500), for it was contemplated that Chreste would furnish the entire capital necessary to transact the business. On the first ten houses constructed, the commissions charged by Chreste were handled somewhat differently from the commissions charged after that date. On these ten houses, Watts paid the commission by check at the date of the execution of the note. After that time, the commission on the "Construction Mortgage Notes" was no longer paid by check at the time of the execution of the note, but was simply deducted by Chreste from the face of the note executed. Thus if the note was for $5,000, Chreste would hold out his commission, give check for $4,500, and take a note for $5,000 drawing 6 per cent. interest.

In the early part of 1927, Watts and Rutherford dissolved partnership, and at that time Chreste purchased all of Rutherford's interest in various notes, and later Watts bought these notes outright from Chreste for the sum of $4,450. Thereafter, Watts continued the construction of the houses for his own account. This construction continued until the early part of 1928 and approximately eighty-five houses and apartments were constructed by Watts and financed by Chreste.

### The Two Kinds of Notes.

During this period of active construction, the accounts between Watts and Chreste were logically divided into two groups:

(a) Chreste would first loan Watts a sufficient amount of money to buy the lot and construct the house. The money necessary to accomplish this purpose was received by Watts upon the execution by him of a "Construction Mortgage Note." This mortgage was a mortgage for the entire amount which was anticipated to be necessary for the purpose of buying the lot and constructing the house. The entire amount of the mortgage was not advanced to Watts at the time of its execution, but was advanced to him week by week as the construction of the house progressed.

From time to time after each house was completed, Watts would sell the house, and the purchaser would go into one of the building and loan associations and borrow a sufficient amount of money to pay Chreste's "Construction Mortgage." Upon the date of the payment of Chreste's "Construction Mortgage," Chreste would release the lien, the account would be closed in his books, and the ledger sheet would be put in a binder book to be kept for future reference.

(b) As Watts would sell these houses, he would obtain from the purchasers small cash payments, and also second lien notes which would represent the balances due on the purchase prices over and above the first mortgages executed by the purchaser to the building and loan associations to pay off Chreste's first mortgages.. These second lien notes would vary in amount in accordance with the balance of the purchase prices due. From time to time, Watts executed to Chreste various personal notes and secured Chreste on these notes by the assignment of the second lien notes obtained by him from the purchasers of the property. Between March, 1925, and November 1, 1928, there were eight of these notes executed, the last of which was a note of $103,650.76, into which there was consolidated and renewed all of the seven prior so-called "Collateral Notes." On these eight notes Watts obtained $80,000 in cash from Chreste, which represented $73,000 net to Watts, $8,000 of which was used to pay off lumber bills. The net amount of the discount charged on these notes was $22,034.75.

In some cases the amount borrowed by the purchaser of the house from the building and loan association proved to be more than was necessary to pay off Chreste's construction mortgage. In such an event, the

purchaser's second lien note would be reduced by the amount of the surplus, and the balance over and above the amount of the first mortgage was ·credited to Watts' "Collateral Account"; and Chreste obtained in place of the second lien note, which he had held prior to that time, a smaller second lien note. In some few instances, the amount borrowed by the purchaser from the building and loan association was insufficient to pay out Chreste's first mortgage by a small amount. In these cases the purchaser's second lien note would be increased by the amount of the deficit, and the deficit would be charged to Watts' "Collateral Account." In every instance, however, Chreste, at the time of the execution by the purchaser of a mortgage to one of the building and loan associations, released his first mortgage on the property.

(c) In May, 1928, Watts refused to continue to collect the rents on the various apartments and other houses which were being rented by him, and on that date Watts simply turned the entire account over to Chreste with instructions to Chreste to collect the rents, take care of the carrying charges on the property, and credit the balance, if any, to Watts' "Collateral Account."

Chreste did this, and continued to do this up to November 1, 1928, the date of the Westview trust agreement.

The enormousness of this record is appalling. There are ten volumes of pleading, twenty-four volumes of evidence, eleven large ledgers, and nine large packages of exhibits. It seemed the parties could agree on nothing and instead of the pleadings serving to narrow the issues they seemed to multiply and expand them. Two public accountants went over the affairs of these men without inducing them to come to an agreement.

What was due Chreste November 1, 1928?

This was a subject these men labored over for a long time themselves without reaching an agreement. Their books were in great confusion. They called in their bookkeepers and secretaries, and all of them worked on it without result. They had an expert accountant go over their books and he was unable to bring these men to an agreement.

Finally the note for $103,650.76 was executed with

the understanding, so Watts claimed, that it should be corrected if errors were found therein.

After Watts filed his suit, he insisted there was great error in this note and Mr. Chreste had a complete audit of his books made and that failed to convince Mr. Watts.

Then Mr. Watts asked that Chreste be required to allow his books, etc., to be audited by Mr. E. B. Fontaine, an auditor selected by Watts. That was agreed to and Fontaine made his audit.

In making this, he was much assisted by the audit Chreste had had made, but Mr. Fontaine was working for Watts and, of course, his audit reflected Watts' view of all matters.

Fontaine went back to the beginning and made a lengthy report in which he set out every item between them and reported there were 646 items aggregating, with interest, $369,034.66 that Mr. Chreste had let Watts have, about which there was, so he reported, no dispute; that there were 1377 items aggregating with interest $330,806.25, which Watts had paid Chreste that was undisputed, so he reported.

He reported one group of 39 items aggregating $9,438.62, claimed by Watts to have been paid, but which Chreste disputed. He reported a group of 34 items aggregating $4,329.31 which he says Watts admits to be due Chreste, but which did not appear in the schedules filed by Chreste, and another group of 16 items aggregating $2,215.55 for which Chreste claimed credit that Watts disputed, and both of them disputed the correctness of the so-called undisputed items.

We shall start with the sums this auditor says are undisputed and try to work out a solution of this puzzle.

There were 58 items aggregating with interest $15,-304.35 which we shall call group (a) in the group of 1377 items that Watts claims to have paid Chreste. This group (a) represents items that never entered into or became a part of any of the "Collateral Notes," but these 58 items were commissions, as Chreste called them, or usury, as Watts called them, the first was paid or deducted January 27, 1926, and the last July 9, 1928, therefore, all of them were barred by section 2517, Kentucky Statutes, since this suit was filed on July 12, 1929. Watts in his brief called this an enormous error for two rea-

sons, the first is this: That so long as he owed Chreste any money, everything he paid him over and above 6 per cent. was usury, so he said, and that the statute of limitations did not apply.

If these were connected transactions, one merging into the other or becoming by renewals a part of the other, that would be true, but these 58 transactions are all separate and distinct transactions, they arose out of the ''Construction Notes,'' and were entirely distinct from and had no connection with any of the ''Collateral Notes'' or any connection with each other. The only thing even tending to connect them in any way is they were all paid by Watts to Chreste or deducted by Chreste from sums loaned to Watts.

The citation of one of these construction loans may serve to explain the others, as the same general plan was followed in all of them. On February 18, 1927, there was executed to Chreste a mortgage for $2,000 upon property at 3243 Cedar street, and between March 5, 1927, and July 23, 1927, Chreste let Watts have $1,800 to improve the property. On July 9, 1928, a loan of $2,-500 was obtained on this property from the Avery Building & Loan Association and Chreste was paid and he released his mortgage. That was then a completed transaction and Chreste was then chargeable with the usury connected with this loan and one year from that time the claim for this usury was barred. This transaction was in no way connected with, or affected by any other transaction between these parties.

Watts' right to sue for and recover the usury in this transaction accrued then and the statute started. When a man can sue he must, and if he does not the statute keeps running. Harlan v. Buckley, 268 Ky. 148, 103 S. W. (2d) 946. These notes evidenced separate and distinct debts arising out of separate and distinct transactions. The trial court in its judgment of December 30, 1933, held:

"1. That the discounts of 10% or less charged by the defendant, Chreste, against the plaintiff, Watts, in the course of the transactions, insofar as such discounts exceeded interest at the rate of 6% per annum, constituted usurious interest.

"2. That Watts' claim for the usurious interest charged in the 'Construction Mortgage Notes' had

been barred by limitations, if such usurious interest was paid by Watts more than one year prior to the institution of this action, except to the extent that such usurious interest was charged into the 'Collateral Account' such usurious interest has not been barred by limitations; and except charges arising out of the Construction Mortgage Account and which charges could have been paid out of funds appropriated to the payment of usury by the defendant.''

There is certainly nothing in that holding of which Watts can complain and Chreste is not complaining.

Watts' complaint is that this ought to be treated as a running account and that no claim for usury should be barred so long as he owed Chreste anything, but as we have stated these 58 transactions were separate and distinct and as to such transactions the rule was correctly stated by the court. See Sutherland v. Owensboro Savings Bank, 8 Ky. Law Rep. 431, and Carter v. Farthing, 115 Ky. 123, 72 S. W. 745, 24 Ky. Law Rep. 1927.

But Watts says if it be correct to deduct these items it is not proper to add interest to them and then deduct them with interest added, but to do otherwise would necessitate a complete recasting of these accounts which we shall not undertake. Watts has been allowed credit for these items and interest in his list of 1,377 items and interest, aggregating $330,806.25, hence these 58 items with interest, or a total of $15,304.35, must be deducted to balance the erroneous allowance.

### Group (b).

Watts was given credit in these 1377 items for the payment of the following mortgages with interest:

| | |
|---|---|
| July 12, 1928, 3240 Hermann street | $ 6,721.00 |
| May 23, 1928, 415 S. 34th street | 4,105.00 |
| Oct. 29, 1928, 3235 Cedar street | 2,500.00 |
| | $13,326.00 |

Watts had claimed credit for these mortgages as paid, but he admits in his testimony they were simply renewed and were not paid, then this group (b) must also be deducted.

### Group (c).

Out of the 39 items totaling $9,438.62, which Fon-

taine claimed credit was due Watts but were disputed by Chreste, the court allowed Watts 16 which we shall call group (c):

| | |
|---|---:|
| June 28, 1926, Tkt. No. 762 | $ 13.69 |
| July 29, 1926, Ck. No. 3576 | .50 |
| Nov. 6, 1926, Ck. No. 3989 | 26.86 |
| Nov. 16, 1926, Tkt. No. 703 | 13.41 |
| Feb. 23, 1927, Tkt. No. 1367 | 19.82 |
| Mar. 23, 1927, Tkt. No. 1568 | 19.73 |
| Apr. 23, 1927, Tkt. No. 3 | 19.64 |
| May 12, 1927, Tkt. No. 160 | 17.41 |
| Sept. 16, 1927, Ck. No. 5316 | 391.84 |
| Nov. 7, 1927, Ck. No. 5510 | .74 |
| Dec. 30, 1927, Ck. No. 5703 | .25 |
| Mar. 9, 1928, Ck. No. 6010 | 15.61 |
| Apr. 9, 1928, Tkt. No. 2212 | 15.53 |
| May 1, 1928, Tkt. No. 2367 | 15.45 |
| Oct. 31, 1928, Credit of Fryrear Note | 100.00 |
| Oct. 31, 1928, Deed Book No. 1382—494 | 1,999.36 |
| | $2,669.84 |

Watts because of these 16 items must have credit for....$ 2,669.84
Adding the sum reported as due Watts................ 330,806.25

$333,476.09
Deducting group (a) $15,304.35, and group (b) $13,326.... 28,630.35

We find Watts paid Chreste.............................$304,845.74

We shall now try to find what was the total of Chreste's claim.

Watts admitted in his testimony owing Chreste on what is termed the Rutherford deal $4,450, which with interest to November 1, 1928, amounts to $4.959.52, which we shall add to Chreste's claim.

### Group (d).

Out of the 34 items aggregating $4,329.31 which Fontaine reported that Watts admitted was due Chreste, the trial court, for some reason we cannot discover, only allowed Chreste 7 items aggregating $2,090.13, which we shall call group (d). Chreste does not complain of the rejection of the other 27 so we shall give no thought to that.

### Group (e).

There were 16 items of credit reported by Fontaine as claimed by Chreste and disputed by Watts, 12 of which the trial court allowed and they are:

July 1, 1926, Tax.................................$  79.30
May 11, 1927, Lot 3221 Lytle St...................  615.56
May 11, 1927, Lot 3812 Lytle St...................  684.91
June 1, 1927, Ins. 3242 Herman....................    2.72
July 1, 1927, Ins. 401 S. 34th....................   57.92
Sept. 13, 1927, Ins. 417 S. 34th..................   21.16
Nov. 4, 1927, City Tax Hammond.....................  59.08
Nov. 4, 1927, City Tax Hammond....................   58.73
July 9, 1928, Ck. No. 4541........................   67.36
Sept. 4, 1928, Paint & Mat. 1740 St. Louis........   49.36
Sept. 17, 1928, Tax Suit No. 195423...............   75.57
Sept. 28, 1928, Ck. No. 4873......................    1.97

$1,773.64

Adding these, we will find the total sum put in by Chreste.

Fontaine reported.....................................$369,034.66
Rutherford deal.......................................   4,959.52
Group (d).............................................   2,090.13
Group (e).............................................   1,773.64

Total Amount due Chreste from Watts...................$377,857.95
Amount Watts paid Chreste.............................  304,845.74

Bal. due Chreste from Watts as found by the suggested
    judgment of July 21, 1934............................$ 73.012.21

The commissioner had prepared a suggested judgment which he filed with and made part of his report. Watts filed exceptions to it.

Every one had begun by this time to see an enormous judgment must go against Watts and on September 10, 1934, the court amended its former judgment and allowed Watts credit for the 8 following sums which we shall call group (f).

## Group (f).

May 9, 1928, Commission on lakeside lot...............$  154.25
May 28, 1928, rebate on insurance.....................   55.15
May 28, 1928, rebate on insurance.....................   26.04
Sept. 4, 1928, Material 1740 St. Louis Ave............   49.36
December 30, 1927, difference in check 5703...........   .26
December 3, 1926, Adjustment on Rutherford deal.......  557.25
October 31, 1928......................................  841.70
April 1, 1926, Discount allowance.....................  175.34

Total ................................................$1,859.35

It will be observed items printed in italics here are duplicates of italicized items in groups (c) and (e).

This $1,859.35 deducted from the judgment for $73,-012.21 prepared July 1, 1934, left $71,152.86 as the net amount Watts owed Chreste November 1, 1928.

### What was Due Chreste October 1, 1934?

On September 10, 1934, E. B. Fontaine was by agreement directed, starting with the balance of $71,-152.86, to bring it and certain mortgage items Watts owed Chreste down to October 1, 1934, and on November 22, 1934, he filed his report of 24 pages which may be summarized thus:

|  | Due Watts | Due Chreste |
|---|---|---|
| $71,152.86 with interest to Oct. 1, 1934........ |  | $ 80,001.84 |
| 1702 Bolling avenue......................... |  | 2,597.17 |
| 3235 Cedar street............................$ | 560.56 |  |
| 2100 Dumesnil street......................... |  | 4,723.46 |
| 2102 Dumesnil street......................... |  | 1,580.40 |
| 1717 Garland avenue......................... |  | 2,166.38 |
| 3230 Herman street.......................... |  | 2,413.66 |
| 3234 Herman street.......................... |  | 2,398.90 |
| 2017 Standard avenue........................ |  | 2,317.97 |
| 403 South 34th street......................... |  | 4,796.33 |
| 415 South 34th street........................ | 768.45 |  |
| 421 South 34th street........................ |  | 5,165.21 |
| 1227 South 21st street........................ |  | 5,225.66 |
| 1230 South 21st street........................ |  | 3,190.43 |
| 1231 South 21st street........................ |  | 4,872.23 |
| 1234 South 21st street........................ |  | 5,233.05 |
| 1235 South 21st street........................ |  | 4,941.15 |
| 1236 South 21st street........................ |  | 3,021.97 |
| Miscellaneous Items..................... |  | 1,250.84 |
| Balance ............................. | 134,567.36 |  |
|  | 135,896.37 | 135,896.37 |
|  |  | $134,567.36 |

Exceptions were filed by both parties and on December 13, 1934, without giving any reason for so doing, the court fixed the amount due from Watts to Chreste at $134,000, adjudged Chreste a lien to secure that on the assets involved and directed a sale, etc.

### Grounds for Reversal.

Watts has asserted many grounds for reversal of this judgment which we shall now consider.

### Motion for a Receiver.

On November 1, 1928, Watts and Chreste realized their affairs were in a dangerous condition and they placed them in the hands of the Westview Land Com-

pany as trustee to hold and manage same and to pay what Watts owed Chreste, and that done to return the property to Watts. This which is copied from that agreement will show how they then felt about it:

"'Whereas during the past three years the party of the third part, Charles Chreste, has furnished all the money for the purchase of ground and erection of many buildings in various parts of the City. And whereas many of the buildings have been sold on very small initial payments and further as many purchasers have failed to continue their payments the properties have been turned back to the parties of the first part necessitating the immediate outlay of additional money. Now in consideration of the third party furnishing to the first party this additional capital and in consideration of commissions previously paid, the parties of the first part have this day conveyed to the second party certain properties hereinafter described.''

As soon as this litigation started, Watts moved for the appointment of a receiver, upon the ground that this Westview Land Company had not, by its charter, power to act as a trustee. That is true, but they agreed it should do so and in default of any action by the commonwealth against it for engaging in business in excess of its charter powers, the court did right in refusing to take these matters out of its hands. See Hind v. Cook & Co., 202 Ky. 526, 260 S. W. 349; Krell-French Piano Company v. Dengler, 145 Ky. 202, 140 S. W. 168; Miller v. Flemingsburg & Fox Springs Turnpike Company, 109 Ky. 475, 59 S. W. 512, 22 Ky. Law Rep. 1039. One of the conditions that must appear before a receiver will be appointed is *that the property or fund is in danger of being lost, removed, or materially injured.* See section 298 of Civil Code of Practice. After six years of litigation and full reports by the trustee, there is no showing that even a dime was lost through its management or that there was ever any danger of any loss. This motion was repeatedly renewed in divers forms throughout this litigation and always overruled, and is the main reliance of Watts on this appeal, but we find no merit in it.

### Was Trust Agreement Obtained by Fraud?

The answer is no. We see not the slightest merit in this claim, the trial court never saw any and its ruling that it was not so obtained is affirmed.

### The Rutherford Deal.

Just why Watts should object to the allowance to Chreste of $4,450 with interest for this purchase after admitting in his testimony it was correct is hard to see, and just what warrant the trial court had for allowing him in group (f) an adjustment of $557.25 we cannot see. Watts certainly got more than he was entitled to on this deal.

### The Lots on Lytle Street.

Watts claims he was to pay $11 per foot for these lots or $693, whereas Chreste insisted they were sold for $1,194.82, which is the sum named in the mortgage given, so the court did not err in accepting the latter figure.

### Insurance.

Watts complains of two items of insurance that were allowed Chreste, $53.60 and $19.80 or a total of $73.40, but in group (f), supra, he was given credit for two items of insurance of $55.15 and $26.04 or a total of $81.19 which we are sure corrected this.

### Watts' Check for $18.

Watts complains because he was not given credit for his check No. 3404 given June 4, 1926, but no such check was ever filed.

### The Hammond Notes.

Watts claimed credit for two notes, one for $1,728.97 and the other for $1,319.72, but if he will look at items 20 and 21 of the notes pledged to Chreste as collateral, he will find these notes.

### The Pollard Note.

Watts claims credit for a note of John W. Pollard, but if he will look at the list of notes put up by him as collateral, he will find this note as item 48.

### The Clough Note.

This Clough note for $848 is now claimed by Watts, but in his testimony in answer to questions 1265 and 1266 he admitted he had no interest in this note.

### Check of September 12, 1925.

Watts has now found a check for $200 that was not included in Fontaine's audit, but it was given for usury or commission and became barred by section 2517, Ky. Stats. on September 12, 1926, almost three years before this suit was brought.

## Other Checks.

Watts is claiming credit for several checks for which he has already received credit, in the list of 1377 items:

$60.00 Check, June 4, 1926, see ticket 635.
$12.50     "     July 7, 1926, see ticket 844.
$25.00     "     April 5, 1928, see ticket 2388.
$13.00     "     Aug. 10, 1926, see ticket 27.
$15.00     "     Mar. 5, 1927, see ticket 1466.

Watts has a check for $286.49 for which he was properly given no credit. Watts took out some life insurance and gave his note for $279.10 to the agent, Cabell, for the premium. Cabell sold the note to Chreste and later Watts gave this check in payment of this note.

We have tried to consider every matter of which Watts is complaining and we have found no merit in any of them.

A moment of thought should have shown Watts there was no merit in his claim, for he had embarked in this building business, which is always hazardous, in the years 1925, 1926, 1927, and 1928, when labor and materials were at their highest and soon found the demand for his finished houses falling off and presently even houses he had sold were thrown back on his hands. Rutherford saw the storm coming in 1927 and he got out. Watts saw it in 1928 and he quit. The storm came and the property had to be sold during the storm. Watts had put in nothing, he was operating entirely on borrowed money. It is an old saying that "No one can put in a shoestring and draw out a tanyard," but Watts had not put in even a shoestring, he had operated on borrowed money entirely and how he could think he had made money we cannot see.

He has had the benefit of a long and patient hearing with all questioned rulings in his favor. The facts were simply against him, his case had no merit, and the judgment is affirmed.